IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


CHARLES J. DOOLEY                      :
                      Plaintiff        :
                                       :
       v.                              :        3:CV-07-0132
                                       :        (JUDGE VANASKIE)
CIBA/NOVARTIS-MORRISTOWN,              :
NOVARTIS PHARMACEUTICALS CORP.         :
                      Defendants       :


<u>MEMORANDUM</u>

       Presently before the Court in this employment discrimination lawsuit is the Motion for

Summary Judgment of Defendant Novartis Pharmaceuticals Corporation ("Novartis").  (Dkt.

Entry 22.)[1]  Claiming his retirement from Novartis in 2006 was due to a course of

harassment motivated by age and disability discrimination, Plaintiff Charles J. Dooley filed a

complaint in this Court asserting numerous causes of action, including violation of the

Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act

("ADEA"), and the Pennsylvania Human Relations Act ("PHRA"), as well as common law

claims of wrongful discharge and intentional infliction of emotional distress.  (Dkt. Entry 1.)

Because the PHRA claim is untimely, and Plaintiff has failed to present competent evidence

that the work environment was so riddled with age and disability bias as to make continued

_____

       [1]For the convenience of the reader of this Memorandum opinion, hyperlinks to the
Court's electronic record and to authority cited herein have been inserted.  No endorsement
of any provider of electronic resources is intended by the Court's practice of using
hyperlinks.

employment intolerable, and because his common law claims of wrongful discharge and

intentional infliction of emotional distress fail as a matter of law, Defendant's Summary

Judgment Motion will be granted.

I. BACKGROUND

Charles J. Dooley was employed by Novartis as a Sales Representative between

November 1988 and January 2006.[2]  (Complaint at ¶¶ 9, 31; Defendant's Statement of

Undisputed Material Facts ("DSUMF"), Dkt. Entry 23, at ¶ 11.)  Novartis researches,

develops, and markets pharmaceutical products.  (DSUMF, Dkt. Entry 23, at ¶ 1.)  Plaintiff

"was responsible for promoting cardiovascular products to primary care physicians,

internists and cardiologists in the Scranton, Pennsylvania territory."  (Id. at ¶ 13.)

"From 2001 until Plaintiff's retirement in early January 2006, the District Manager for

Central Pennsylvania was Thomas Aniska."  (Id. at ¶ 15.)  Aniska's supervisor was the

Regional Director of the Mid-Atlantic Region, which between 2001 and the spring of 2005

was Lisa Pilla, and from then until Plaintiff's retirement was Christopher Esposito.  (Id. at ¶

16.)

A Sales Representative promotes Novartis products and is "responsible for calling on

physicians, hospitals, pharmacies and other health-related organizations or personnel within

their assigned territories."  (Id. at ¶ 2.)  Representatives typically travel "from doctor's office

---

[2] Plaintiff commenced his employment with a predecessor of Novartis. (Id. at ¶ 11.)

to doctor's office in an effort to meet with physicians to discuss Novartis' products." (Id. at ¶ 3.)  A typical physician call includes a face-to-face "two way discussion and request for business." (Plaintiff's Statement of Undisputed Material Facts ("PSUMF"), Dkt. Entry 35-2, at ¶ 4.)  An ideal call should include "discussion of three Novartis products, as well as 'probes, questions, features, advantages, benefits, summaries and closes.'" (DSUMF, Dkt. Entry 23, at ¶ 5.)  "[M]odel product presentations were often difficult" and Representatives were often forced to find creative ways to see physicians, including "bringing in treats, lunches, and samples." (Id. at ¶ 6; PSUMF, Dkt. Entry 35-2, at ¶ 5.)

Representatives also were expected to plan and host educational programs.  All Representatives were required to host three programs per trimester, which required "retaining the speaker, scheduling the date and location for the program, and inviting and ensuring the attendance of as many physicians as possible." (DSUMF, Dkt. Entry 23, at ¶ 7; PSUMF, Dkt. Entry 35-2, at ¶ 7.)  Similar to educational programs, Representatives were also expected to host five roundtable programs per trimester to speak with physicians about Novartis' products. (DSUMF, Dkt. Entry 23, at ¶ 8; Dooley Deposition ("Deposition"), Dkt. Entry 36-2, at 198.)  Representatives were also required to participate in a continuing education program called "I-learn." (PSUMF, Dkt. Entry 35-2, at ¶ 10.)

Between 2001 and 2006, Aniska would periodically ride along with Plaintiff in the field to observe and/or participate in the sales calls with Plaintiff. (DSUMF, Dkt. Entry 23, at

¶ 17; Deposition, Dkt. Entry 36-2, at ¶ 40.)  The primary purpose of the "ride-along" was to observe the Representative's performance and give feedback on what was done right and what could be improved in future physician calls.  (Deposition, Dkt. Entry 36-2, at 40-41.)

A Representative's sales results were calculated by "tracking the number of prescriptions written for the pertinent Novartis products by physicians in the respective sales representative's particular territory."  (DSUMF, Dkt. Entry 23, at ¶ 21.)  "Plaintiff had a counterpart in his territory who was responsible for promoting the same products to the same physicians as Plaintiff, although they would not call on physicians at the same time."  (Id. at ¶ 22.)  Therefore, sales results in a particular area were a "team effort," and a Representative's counterpart would have identical sales results.  (PSUMF, Dkt. Entry 35-2, at ¶ 20; Deposition, Dkt. Entry 36-2, at 80-81.)

Although Plaintiff's sales were generally high, his supervisors were concerned with his planning, territory management, and administrative skills.  In 1998, his former supervisor, Thomas Scherer, felt that Plaintiff's planning and territory management were items of concern.  (Deposition, Dkt. Entry 36-2, at 99-100; Scherer Affidavit, Dkt. Entry 36-24, at ¶¶ 4, 12.)  As a result of below expectation performance in the later part of 1997 and the beginning of 1998, Scherer placed Plaintiff on a Territory Action/Tracking Plan in April of 1998.  (1998 Tracking Plan, Dkt. Entry 25-7.)  Although Scherer's affidavit purports that taking Plaintiff's "year in total he always did a good job," Plaintiff's Business and

Development Report for September 1998 stated that Plaintiff needed to individualize his sales presentations and increase his call average. (Scherer Affidavit, Dkt. Entry 36-24, at ¶ 17; Business & Development Report ("BDR"), Sept. 2, 1998, Dkt. Entry 25-7.) Additionally, Scherer noted that the customers "don't feel a 'sense of urgency'" in Plaintiff's promotion of Diovan, and recommended that Plaintiff forget about rumors and issues he had no control over and concentrate on sales. (BDR, Sept. 2, 1998, Dkt. Entry 25-7.) In a September 22, 1998, memo, Scherer reiterated the importance of planning and territory management, mentioning that Plaintiff was driving too much, seeing too few physicians, and should become more comfortable working with word processing and email applications. (Id.)

Plaintiff's next District Manager, Dale Snyder, made similar observations, noting the need to develop a greater "sense of urgency," develop a "better record-keeping system," improve call average, and develop a more focused pre-call plan. (1999 Performance Management Process, Dkt. Entry 25-6, at 3.) Although Plaintiff met expectations in most areas of his evaluation, Snyder noted the need to "work towards achieving 9 calls per day," to "take the initiative to use all available resources to create face time with physicians," and to enhance his coping with change and corporate decisions. (Id. at 5, 8.)

Plaintiff was on a medical leave of absence from April, 2000 until November, 2000 to have surgery for stomach cancer. (DSUMF, Dkt Entry 23, at ¶ 31.) Although reporting problems with stamina, Plaintiff returned to work without any medical restrictions.

(Deposition, Dkt. Entry 36-2, at 15, 18.)  In part, Plaintiff stated,

> It wasn't so much that I couldn't do other things.  It was a matter that . . . I came back as soon as I could put in a full day's work, but when I came home from work, I was totally exhausted.  So my choice was either to take a nap right after work so that I could do my paperwork late at night or else – or else eat dinner and do my paperwork and find myself almost falling asleep while I was doing it.

(Id. at 16.)  Plaintiff reported these symptoms as lasting a few months, into early 2001, after which he gradually progressed to the point where he was not so exhausted that he could not do his paperwork.  (Id.)

Because of Plaintiff's short-term disability leave, a Year End Assessment of 2000 was not completed.  Plaintiff's mid-year review, however, revealed that Plaintiff was experiencing many of the same challenges as he had experienced in the past.[3]

In 2001, Aniska was promoted to District Manager and became Plaintiff's immediate supervisor.  At this time, Plaintiff was 53 years old.  (PSUMF, Dkt. Entry 35-2, at ¶ 37.) Plaintiff's 2001 Performance Review indicated that he exceeded expectations regarding sales, was noted as working well with his counterparts, having "excellent product knowledge and selling skills," and a "good work ethic."  Despite this favorable performance, the Review

---

[3] Plaintiff's review recommended that he "look for alternative ways to gain face time with physicians," "improve communication with teammates," and reiterated that he continued "to struggle with the need to change [his] behavior to adapt to the new Novartis environment" and adapt his "behavior, style and message to meet different customer needs."  (2000 Performance Management Process, Dkt. Entry 25-6, at 7.)

also indicated that Plaintiff maintained the same developmental needs, including the need to be "more receptive to change," to increase his calls per day, to "[b]e creative and innovative to get physicians in a more informal atmosphere," to "present three products on all calls," to "stay on top of admin.," and to become "[m]ore familiar with [the] computer." (2001 Annual Performance Review, Dkt. Entry 25-6, at 4, 6.)

Although Plaintiff's sales remained above the national, regional, and district averages, many of these purported deficiencies were again reported in 2002. (2002 Annual Performance Review, Dkt. Entry 25-4, at 15.) Plaintiff's calls per day was 1.5 doctors below the district average, and Aniska's notes indicated a need to adapt to change, increase call average, stay on top of administrative activities, and become more familiar with the computer. (Id. at 19.) His 2002 Annual Performance Review rated his skills in Knowledge Expertise and Selling Process as exceeding expectations, but his Territory Management and Results Focus as only partially meeting expectations. (Id. at 18.)

Around this time, Plaintiff began noticing a strained relationship with Aniska. On a very hot day, in the summer of 2002 or 2003, Plaintiff and Aniska were eating lunch when Plaintiff commented, "I don't think I have the stamina that I used to," to which Aniska replied, "what do you want, slack." (Deposition, Dkt. Entry 36-2, at 18.) Additionally, between the time Aniska became Plaintiff's supervisor and January 3, 2006, Plaintiff asserts that Aniska stated to Plaintiff on numerous occasions that

7

perhaps I ought to retire, perhaps I ought to quit, perhaps I ought to get into another division, perhaps I ought to consider part-time pharmaceutical work, perhaps I ought to change companies . . . I should retire or leave before I realize that I couldn't do it . . . . Perhaps I ought to leave before I become embarrassed.  Perhaps the job was getting too much for me.

(Id. at 9.)  Although Plaintiff remembers these comments, he can not remember any circumstances under which they were made, recall the dates of the comments, or provide the names of witnesses to these comments, other than to remember that the first statement – about whether he could "do the job" – occurred in 2001 when he and Aniska first met. (Affidavit, Dkt. Entry 36-23, at ¶ 73.)

In early 2003, Aniska sent Plaintiff a letter discussing his concern for Plaintiff's "lack of familiarity or willingness to adhere to many of the [the company's] administrative duties." (Aniska Letter, Dkt. Entry 25-11, at 1.)  Aniska listed administrative duties that Plaintiff was failing to complete, reiterated the need for more roundtables and lunches, identified areas of "immediate concern," and enclosed examples of Plaintiff's most recent expense report errors and a copy of the company's work expectations of Plaintiff.  (Id.)

In a March 24, 2003, e-mail from Aniska to Plaintiff, Aniska noted that on their most recent ride-along on March 20, 2003, Plaintiff traveled 135 miles to see "2 PA's and 1 tier 3 physician," which was not acceptable.  (Mar. 24, 2003 Email, Dkt. Entry 25-11.)  Plaintiff contends that he went out of his way that day to go "to the satellite office of this doctor to catch the doctor where he had more free time to speak to them.  The doctor was supposed

to be there but wasn't when they arrived." (PSUMF, Dkt. Entry 35-2, at ¶ 44.)

In 2003, Plaintiff's sales were above the national but below the regional average. (2003 Annual Performance Review, Dkt. Entry 25-5, at 2.) His share change was "below regional and district avg. for all priority products," as a result of which his ranking stayed flat. (Id.) Although Plaintiff's share change was below the regional and district average, he still maintained an "exceeded expectations" rating in the area of sales goals. (Id. at 6.) Aniska noted that:

> Your ranking of 3 on the objectives portion of these [sic] review is due mostly to your national rank. As you will read below, there are numerous areas of improvement under call focus, customer focus and personal development. These are all measured against both the district averages and the averages of your counterpart.

(Id. at 3.) Aniska's evaluation went on to list areas for improvement, including the need to increase his 7.4 calls per day to at least ten. (Id. at 3-4.)

Plaintiff appeared aware of the areas in which he was struggling, and in his 2003 self-appraisal, he describes his selling process as: "selling skills adequate: closing skills need work." (Id. at 9.) He also noted the need to work on his computer skills, observing that he was "not by nature a computer person" but eventually got it after a few tries. (Id. at 11.) Aniska noted that Plaintiff's commitment was below average, noting that he performed according to his own "expectations and what may have been the norm in the past," as opposed to current Novartis values, behaviors and expectations. (Id. at 9.)

On January 1, 2004, the Regional Director, Lisa Pilla, sent an e-mail to Plaintiff and Aniska regarding a recent ride-along with Plaintiff.  (Jan. 1, 2004 Email, Dkt. Entry 25-9.) Pilla noted that Plaintiff's demonstrated strengths included: 1) his knowledge of prescribing patterns and social styles of physicians; 2) his awareness of targets' prescribing potential and recognition of who to target to achieve share growth; and 3) his response to coaching and incorporation of feedback.  (Id.)  Areas that Pilla noted could be improved included territory management and selling process.  (Id.)  Pilla noted that Plaintiff needed to ensure that his daily routing stayed "current with physicians' office hours/schedules" based, in part, on visiting three physicians who were not in, and work on creating call continuity, purposefully probing, using visuals, and discussing multiple products on calls.  (Id.)

On February 2, 2004, Plaintiff was placed on a Territory Coaching Plan.  (First Coaching Plan, Dkt. Entry 25-7.)  The behaviors to be addressed included increasing call frequency; meeting target call attainment; meeting call per day expectations; improving call planning and routing; creating an action plan; increasing lunches, programs, and roundtables; creating accurate and timely activity plans; recording call notes; timely submitting administrative material; creating call continuity; and incorporating at least two probes per call.  (Id. at 2-10.)  Aniska also noted the completion of only one of nine I-learn credits, which was unacceptable.  (Id. at 10.)  Plaintiff admitted he was not timely completing administrative duties, but contended that other Sales Representatives also failed

10

to submit reports on time.[4]

During the course of Plaintiff's Territory Coaching Plan, Aniska evaluated Plaintiff numerous times.  Early after the plan began, Aniska noted that he saw positive changes in Plaintiff's purposeful probing, directness in closing, and call continuity.  (BDR, Feb. 24, 2004, Dkt. Entry 25-13, at 1.)  In March, Aniska noted that Plaintiff's attempts to improve were commendable, but he had only "touched the tip of the iceberg."  (Field Observations, Dkt. Entry 25-8, at 2.)  In contrast, an e-mail dated March 2, 2004, revealed that Plaintiff had not submitted his weekly reports, special reports, or ref tracker.  (Aniska Email, Mar. 2, 2004, Dkt. Entry 25-11.)

At around the same time, Plaintiff participated in a required ride-along with another Sales Representative, Amy Fink.  Plaintiff observed that her day was "very well planned geographically," that they "did no excess driving;" and that Amy seemed to get there at the "best times," allowing her time to chat with the doctors. (Ride-Along Letter, Dkt. Entry 25-4, at 1.)  At the end of the letter, Plaintiff noted that Amy had made nine calls by 2:00 p.m., commenting that "[i]t must be nice to be young and strong."  (Id.)  In response, Aniska noted that Amy's achievements were what was expected.  Regarding Plaintiff's comment that Amy was "young and strong," Aniska stated that Amy's performance had "nothing to do with

_____

[4] Plaintiff recalls having four weeks of reports to send in, but that Jim Burns also had four weeks of reports to send in.  (PSUMF, Dkt. Entry 35-2, at ¶ 51.)

11

being young and strong," but "everything to do with being committed."  (Aniska Email, Mar. 3, 2004, Dkt. Entry 25-4.)

Despite what appeared to be early progress, two weeks later Aniska noted that Plaintiff was again "struggling to see 10 doctors per day" and needed to "be more convincing and confident" in his message to physicians.  (BDR, Mar. 22, 2004, Dkt. Entry 25-13, at 2.) Plaintiff's administrative responsibilities continued to be below par and Aniska had to remind him to make sure he had the most recent data downloaded to his computer, since they had been working "with 2 week old data."  (Id.)

By the end of April, it appeared that any progress made by Plaintiff had been lost. Aniska noted a "lack of progress toward [Plaintiff's] coaching plan,"and  that Plaintiff was still struggling with "'territory management [sic], lack of access and relationship, lack of ref activity and poor administrative activity."  (BDR, Apr. 20, 2004, Dkt. Entry 25-13, at 1.)  It was Aniska's opinion that Plaintiff's coaching plan goals were not being met and that "lack of implementing the basic fundamentals (preparation, execution and administrative responsibility) set [Plaintiff] up for failure."  (Id.)  Aniska did acknowledge that he received a note from Plaintiff's physician stating that health issues had precluded him from his coaching plan reporting for a two-week period, but the doctor had also stated "that those issues have been resolved" and Plaintiff had "no restrictions as to job expectations."  (Id. at 3.)  Aniska's Field Observations noted:

12

> [I]n addition to our most important goal of sales, [administrative duties are] equally important to the success of our organization.  I don't think you understand nor care of its importance.  Numerous times over this coaching plan, we have addressed such things as NEC, reporting correctly and on time, email and voicemail, time off territory etc.  This has become a tremendous source of my frustration.  How can 11 people report correctly and with no problems and my time is spent fixing your errors while neglecting my own responsibility.

(Field Observations, April, Dkt. Entry 25-8, at 3.)

Plaintiff's coaching plan ended on May 3, 2004, and was discussed with Plaintiff on May 5, 2004.  (Final Evaluation, Dkt. Entry 25-8.)  Although the assessment showed improvement in some areas, it revealed that Plaintiff's performance was still below expectations in a number of categories.[5]  (Id.)  Plaintiff disagreed with many aspects of his assessment, noting that "[t]here is no representative [that] would meet all of the requisite components of a call when being held to this high of a standard." (PSUMF, Dkt. Entry 35-2, at ¶ 58.)

After Plaintiff's initial coaching plan Aniska continued to ride along with Plaintiff. Aniska noted that Plaintiff still needed to "focus on preparation, execution and administrative responsibilities."  (BDR, May 26, 2004, Dkt. Entry 25-13, at 2.)  In June of 2004, Aniska noted:

> You are still doing excessive driving.  We drove from town to town to find

---

[5] The assessment indicated that Plaintiff met expectations in sales totals, but not in sales calls, planning and administration.  (Final Evaluation, Dkt. Entry 25-8.)

doctors.  We were working in the Mid Valley [which] has a high concentration
of tier 1 physicians.  We made one call, waited and then were turned away
from an appointment, then traveled out of the Mid Valley to Scranton to see
Dr. Remick.  We were shut out there as well.  We waited 10 minutes in his
parking lot and left to pick up your lunch.  When we got to the lunch the
physician called to say he was on his way.  The nurse told him you were
waiting.  He didn't know who you were.  He called back 5 minutes later and
cancelled lunch.  The nurse said she would call you tomorrow to come back.
By 2 o'clock the next day we still had not received the call.

I asked you to submit 3 reports that evening. 1. Our monthly ROI report that is
due the 25th of each month.  It was June 2nd and I still hadn't received it.  2.
A top ten list of physicians to implement your new plan for call continuity.  It
was supposed to be to me by 5/28/04.  3.  Finally, I asked that you [sic] a list
of your targets by town so I could assist in improving routing.  I recieved [sic]
none of the reports by email.  You did present your target list names on a
hand written paper but used targets for T-1-04.  This is an example of your
disregard for administrative and mandatory reporting.  Your response was
that you had people over and couldn't do it.

(BDR, June 2-3, 2004, Dkt. Entry 25-14, at 2-3.)

Plaintiff contends that Aniska's criticism was part of a pattern of harassment based
upon age and disability bias intended to drive Plaintiff from his job.  He avers that the
situation involving a physician who missed the appointment was highly unusual "as 99 times
out of 100 if a doctor makes an appointment, they keep it." (PSUMF, Dkt. Entry 35-2, at ¶
59.)

On July 1, 2004, Aniska sent an e-mail reminding Plaintiff of administrative
procedures and expectations, the need to request time off territory by voicemail and e-mail,
and the requirement to request vacation time in advance.  (Aniska E-mail, July 1, 2004, Dkt.

Entry 41.)  Aniska noted that "[a]ll requested DM reports should be submitted through e-mail.  Most recently I received your weekly itinerary hard copy through the mail.  This has been common in the past and an issue we have addressed numerous times."  (Id.) Additionally, Aniska requested Plaintiff submit "all monthly DM requested reports on time. For the second month, I am still awaiting the arrival of your budget ROI tracker."  (Id.)  As a result, Plaintiff was placed on a second Territory Coaching Plan beginning July 5, 2004.

Plaintiff's second Territory Coaching Plan focused on three areas of improvement – territory management, selling effectiveness, and administrative duties. (Second Coaching Plan, Dkt. Entry 25-9.)  On July 8, 2004, Regional Manager Pilla did a half-day ride-along with Plaintiff and noted improvements in Plaintiff's routing, call objectives, and itinerary. (Pilla Email, July 25, 2004, Dkt. Entry 25-9.)  Pilla also noted that Plaintiff needed to work on his purposeful probing, use of visual aids, and closings.  (Id.)  Plaintiff's initial evaluations from Aniska revealed an improvement in call continuity, but the need to use more visual aids; close stronger; and continue to improve the routing of his sales visits.  (BDR, July 21, 2004, Dkt. Entry 25-14, at 1-3.)

By September, Aniska noted that Plaintiff had shown improvements in relationship building, but still needed to work on his closings, his probing, the frequency of roundtable and ref activity, use of visual aids, record keeping, and routing. (BDR, Sept. 2, 2004, Dkt. Entry 25-14, at 2.)  In November, Aniska again noted that Plaintiff's purposeful probing,

closing, and call continuity needed improvement, as did his ability to differentiate Diovan from other products.  (BDR, Nov. 4, 2004, Dkt. Entry 25-14.)

Plaintiff's 2004 Annual Performance Review showed that his sales were above the national average, but his market share had declined.  (2004 Review, Dkt. Entry 25-9, at 3.) Plaintiff's productivity goals showed that his calls per day average was below average.  (Id. at 4.)  Aniska's appraisal of Plaintiff's performance of Novartis values and behaviors ranked him as below expectations in every category, based on his lack of outside activity, creativity or innovation, purposeful probing and direct closing, planning, and his "unwillingness to change or try to change." (Id. at 9.)  Plaintiff's ultimate evaluation for 2004 was a 2/1, indicating that Plaintiff had achieved good sales results, but exhibited unsatisfactory behaviors.  (Id. at 12.)  Aniska noted that while Plaintiff's ranking in sales remained in the top ten, the activity observed in the field would not be expected to achieve such a positive performance.  Aniska observed that "[i]f you can post this type of ranking with this type of activity, imagine if you were meeting minimum requirements." (Id.)  Aniska also commented that the promotion of Plaintiff's counterpart in his sales territory would pose "a true test to continue the trends and performance in the territory." (Id.)  Plaintiff refused to sign his 2004 evaluation.  (Id.)

On March 11, 2005, in a letter addressed to Kristen Marks in Novartis' Human Resources Department, Plaintiff enclosed a copy of his 2004 Annual Performance Review

along with seven pages of typed comments dated February 28, 2005. (Marks Letter, Dkt. Entry 25-10.) Plaintiff expressed his dissatisfaction with his 2004 and 2003 reviews, stating that he had come to the conclusion that Aniska wanted him to leave Novartis, and that Aniska had made comments along those lines. (Id.) He noted the inconsistency in achieving a rating of exceeds expectations in sales objectives in 2003, when he was in the top ten in the region, and a rating of meets expectations in 2004, when he again posted a top ten ranking. Plaintiff also questioned his rating of below expectations in every administrative and sales skills categories in light of the sales performance. Plaintiff stated that he did not believe he would ever satisfy Aniska and that this was "dismaying as well as de-motivating." (Id.) Plaintiff alleged that he was given restrictions that others were not and that his poor reviews had cost him thousands of dollars in bonuses. (Id.) Plaintiff admitted that he was not as aggressive as he should be, needed to improve his probing and closing, and that there were other categories in which he should improve, but that he had made attempts to improve that Aniska failed to acknowledge. Plaintiff objected to "the tone in which the criticisms" were made, asserting that Aniska had created a hostile work environment. (Id.) Plaintiff went through each category of his 2004 Review, asking for specific examples and asserting facts in opposition to Aniska's conclusions. (Id.)

Through the beginning of 2005, Plaintiff's evaluations showed that he was still having trouble with routing, call continuity, closing, presenting three products on each call, and

17

making ten calls a day.  Aniska, however, did observe better reception at one office and recommended that Plaintiff apply this strategy to other offices. (BDR, Jan. 19, 2005 & Feb. 15, 2005, Dkt. Entry 25-15.)  In April, an e-mail between Aniska and Carol Montouri revealed that Plaintiff was still making errors in his reports despite having been directed to correct the mistakes.  (Aniska/Montouri Email, Apr. 7, 2005, Dkt. Entry 41.)

On June 6, 2005, at the suggestion of Human Resources, Plaintiff provided a copy of his 2004 Review comments to his new Regional Director, Chris Esposito. (DSUMF, Dkt. Entry 23, at ¶ 69.)  Plaintiff's letter attached his comments to the annual review and asserted:

> [Aniska's] reviews have cost me many thousands of dollars in raises, stock options and promotions.  For the two years prior to this one I have received 3's [exceeds expectations] in Sales and 1's [below expectations] in administration.  This year, in fact, I finished in the top 10 in the Region, but my rating was (somehow) diluted to a 2 [meets expectations].  I hope you can explain this to me.
>
> His comments are not only phrased in the most demoralizing way, they are inaccurate and unsubstantiated.  If my integrity and honesty are going to be slandered, I deserve examples and explanations.

(Esposito Letter, Dkt. Entry 25-10, at 1.)

At some point over the course of the next two months, Esposito rode along with Plaintiff to discuss his concerns.  (DSUMF, Dkt. Entry 23, at ¶ 70.)  During the course of the ride-along, "Plaintiff and Mr. Esposito discussed the fact that Plaintiff might be put on a Performance Improvement Plan ("PIP"), and Mr. Esposito explained to Plaintiff that as long

18

as he worked hard and fulfilled all of his obligations, he would be fine." (Id.)

In Plaintiff's June evaluation many of the same concerns were reiterated, including the need for speaker programs, roundtables and improved closing and probing. (BDR, June 22, 2005, Dkt. Entry 25-15, at 1.)  This report also noted that Plaintiff's sales "ranking is falling drastically from 45 at 2004 year end to 225 for [M]arch." (Id.)  In July, Aniska noted the increased use of brochures and visuals, but again noted the importance of roundtables, dinners, strong closings, and probing. (BDR, July 20, 2005, Dkt. Entry 25-15.)  By August, Aniska noted that Plaintiff was still having very little impact during his calls, should be using probes, should be adapting his message to the physicians, had not increased his roundtables, and needed better territory management and stronger closes. (BDR, Aug. 10, 2005, Dkt. Entry 25-15.)

By memorandum dated September 26, 2005, Aniska informed Plaintiff that he had been placed on a PIP to improve his selling process, territory management, and results focus.  (PIP, Dkt. Entry 25-7.)  Aniska wrote that both he and Esposito wanted Plaintiff to be successful and placement on the PIP for a period of up to ninety days was intended to address areas that needed to be improved to a level that meets expectations.  (Id. at 3.)  Aniska's memorandum warned Plaintiff that if he did not satisfactorily complete it, termination was possible.  (Id.)

Plaintiff had heard from numerous representatives over the years state that "once

one is placed on a PIP, one is on a slippery slope out the door." (Deposition, Dkt. Entry 36-2, at 119.)  Additionally, Thomas Scherer, Plaintiff's former supervisor, noted that "[g]enerally when a representative is put on a PIP, it is the kiss of death and they are not expected to be with the company much longer." (Scherer Affidavit, Dkt. Entry 36-24, at 2.)

On October 12, 2005, while on a ride-along with Aniska, Plaintiff developed a sudden illness and Aniska drove him home for safety reasons.  (BDR, Oct. 12, 2005, Dkt. Entry 25-15.)  Also in October of 2005, Aniska received a report that Plaintiff had remarked to an employee in a doctor's office that she looked "delicious." (PSUMF, Dkt. Entry 35-2, at ¶ 77.) The employee noted that Plaintiff told her she "looked delicious" while staring at her breasts. Plaintiff, however, asserts that although he told her that she looked delicious and that when the employee reached over the table her dress was kind of "flopping over," the two incidents did not occur at the same time.  (Deposition, Dkt. Entry 36-2, at 107-11.)

At about the same time, Plaintiff became aware of the need for removal of his gallbladder. (Deposition, Dkt. Entry 36-2, at 19, 27.)  On October 26, 2005, Plaintiff e-mailed Esposito requesting a suspension of the PIP based on his upcoming surgery. (Dooley/Esposito E-mail, Dkt. Entry 36-21.)  Plaintiff also asked for Esposito's thoughts regarding their most recent ride along, noting that Aniska had said that Esposito had been "pretty disappointed with the day."   Esposito responded that he would clarify Plaintiff's questions by phone and urged him to continue his dialogue with corporate health and HR so

that he could maximize the benefits he was entitled to regarding his upcoming leave. (Id.)

During his short-term disability leave Plaintiff's PIP was suspended.  (PSUMF, Dkt. Entry 35-2, at ¶ 78.)  On November 30, 2005, during the course of his medical leave, Plaintiff called the Novartis Alertline to complain of the hostile work environment created by Aniska. (Alertline Memorandum, Dkt. Entry 41, at 1.)  The call report summary stated "Charles Dooley said Thomas Aniska creates a hostile work environment because he is a micro-manager and he unfairly and excessively criticizes employees.  Also, Charles said he plans to resign because Thomas treats him unfairly." (Id.)  The memo provides details of the Alertline conversation, including the fact that Plaintiff stated that Aniska had created an "unpleasant and tense working environment for the sales representatives" and that Aniska is "extremely critical of his subordinates and micro-manages them, instructing employees on every aspect of their jobs . . . ." (Id. at 3.)  Plaintiff reported that four employees had left the district since Aniska became the sales manager because they could not tolerate Aniska.

Plaintiff returned to work on Monday, December 19, 2005.  In a letter dated December 21, 2005, and faxed to Aniska on December 22, 2005, Plaintiff wrote that "I am announcing my retirement from Novartis Pharmaceuticals Corporation.  My last day of work will be January 3, 2006." (Retirement Letter, Dkt. Entry 25-7.)  Plaintiff stated that nothing happened upon his return to work that led to his decision to resign.  (Deposition, Dkt. Entry 36-2, at 118.)  Instead, his decision was made while on leave. (Id.)

On July 26, 2006, Plaintiff, represented by his current counsel, filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that Aniska considered Plaintiff's "age and perceived disability as being an obstacle" to Plaintiff being an effective employee.  (EEOC Complaint, Dkt. Entry 25-10, at 2.)  Plaintiff alleged that he was "harassed and demoralized" and "given restrictions that others in the district did not receive."  (Id.)  Plaintiff asserted that in response to his complaints, "Aniska increased the harassment in retaliation" and that as a result he was "unable to endure the discriminatory, humiliating, embarrassing, and harassing conduct" and was "forced to resign on January 3, 2006, for his own health and safety."  (Id. at 3.)  Plaintiff's charge was dually filed with the Pennsylvania Human Relations Commission ("PHRC").  (Id. at 4.)

Plaintiff's administrative complaint was dismissed by the EEOC on December 22, 2006, based on his failure to respond within 30 days to the EEOC's request to appear, be available for interviews, or provide information which made it impossible to resolve his charge.  (Id. at 8.)  The notice of dismissal informed Plaintiff of the right to institute suit.

On January 24, 2007, Plaintiff filed the current action.  Upon the close of discovery, Defendant moved for summary judgment.[6]  (Dkt. Entry 22.)  The issues have been fully

---

[6]Plaintiff has moved to strike Defendant's Statement of Material Facts, asserting that it fails to comply with Local Rule of Court 56.1, which requires that motions for summary judgment include "a separate, short and concise statement of material facts." (Dkt. Entry 28, at 1.)  Plaintiff argues that many of Defendant's statements include numerous facts that

(continued...)

briefed and are ripe for review.

II.  DISCUSSION

    A. Standard of Review

    Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986).  "Facts that could alter the outcome are material facts."  Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 197 (3d Cir. 1994). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

    Initially, the moving party must show the absence of a genuine issue concerning any

---

    [6](...continued)
require numerous specific denials within each paragraph.  While there are instances of lengthy statements of fact being set forth in a single paragraph, each paragraph concerns a discrete matter or incident.  Moreover, this Court has been able to analyze Defendant's amply supported factual statements, as well as Plaintiff's specific admissions and denials, for the purpose of determining whether there is a genuine dispute of material fact. Accordingly, the Motion to Strike Statement of Undisputed Fact (Dkt. Entry 28) will be denied.

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  All doubts as to the

existence of a genuine issue of material fact must be resolved against the moving party,

and the entire record must be examined in the light most favorable to the nonmoving party.

White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988), abrogated on other

grounds, Hazen Paper Co. v. Biggins, 570 U.S. 604 (1993).  Once the moving party

satisfies its burden, the nonmoving party "must present affirmative evidence in order to

defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257.

Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand

a motion for summary judgment once the moving party has presented evidentiary materials.

Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  Rule 56 requires

the entry of summary judgment if there was adequate time for discovery and a party "fails to

make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party" bears the burden of proof at trial.[7] Celotex, 477 U.S. at 322.

---

[7]To support the assertion that there is a material issue of fact, Plaintiff presented his own Affidavit.  Defendant asserts that the Affidavit contradicts statements made in his Deposition.  Although a conflict between a witness' affidavit and his deposition testimony is not grounds for excluding the statements in the affidavit, "the testimony in the deposition will be treated as more reliable than the statements in the affidavit." United States v. Johns-Manville Corp., 259 F. Supp. 440, 456 (E.D. Pa. 1966) (citing 6 Moore's Federal Practice, ¶ 56.22(1)).  "'If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" Martin v. Merrell Dow Pharm., Inc., 851 F.2d 703, 706 (3d Cir. 1988)

(continued...)

B.  Timeliness of PHRA Claims

Defendant claims that the PHRA claims are untimely because the administrative

charge of discrimination was filed outside the statute of limitations.  The PHRA provides in

relevant part that "[a]ny complaint filed pursuant to this section must be so filed within one

hundred eighty days after the alleged act of discrimination . . . ." 43 P.S. § 959(h); see

Pittman v. Cont'l Airlines, Inc., 35 F. Supp. 2d 434, 441 (E.D. Pa. 1999) ("Under the PHRA,

a plaintiff must file with the PHRC within 180 days of the discriminatory conduct . . . .").

> If a plaintiff fails to file a timely complaint with the PHRC, then he or she is
> precluded from judicial remedies under the PHRA.  The Pennsylvania courts
> have strictly interpreted this requirement, and have repeatedly held that
> 'persons with claims that are cognizable under the Human Relations Act must
> avail themselves of the administrative process of the Commission or be
> barred from the judicial remedies authorized in Section 12(c) of the Act.'

 Woodson v. Scott Paper, Co., 109 F.3d 913, 925 (3d Cir. 1997) (quoting Vincent v. Fuller

Co., 616 A.2d 969, 974 (Pa. 1992)).

---

[7](...continued)
(quoting Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)).
Where there are unexplained inconsistencies between the Affidavit and Deposition, the
Deposition testimony will be treated as more reliable and the Affidavit will not suffice to
create a genuine issue of material fact.  See Jiminez v. All Am. Rathskeller, Inc., 503 F.3d
247, 253 (3d Cir. 2007).  Moreover, many of the statements in the Affidavit are conclusory
assertions and inadmissible hearsay that do not constitute competent evidence.
Statements that are not admissible or capable of being rendered admissible at the time of
trial are not to be considered in deciding a summary judgment motion.  See Pamintuan v.
Nanticoke Mem'l Hosp., 192 F.3d 378, 387 n.13 (3d Cir. 1999); Houser v. Fox Theatres
Mgmt. Corp., 845 F.2d 1225, 1230 (3d Cir. 1988); Ruggieri v. Quaglia, No. 07-756, 2008
WL 5412058, at *4 (E.D. Pa. Dec. 24, 2008).

Plaintiff's PHRA claims are time barred.  Plaintiff has failed to allege that any discriminatory acts occurred on or after January 27, 2006, 180 days before Plaintiff filed his administrative agency complaint on July 26, 2006.  Any argument that Plaintiff's claims are timely under a continuing violation theory is likewise without merit as there is no allegation that a discriminatory act occurred on or after January 27, 2006.  Plaintiff's claim for violation of the PHRA and retaliation under the PHRA will therefore be dismissed as untimely.

C.  Timeliness of ADEA and ADA Claims

Although acknowledging that Plaintiff's constructive discharge claims under the ADA and ADEA are timely,[8] Defendant asserts that claims based upon discrete incidents that occurred more than 300 days before the filing of the complaint with the EEOC are time-barred.  Defendant places in this category the 2003 and 2004 performance evaluations, the Territory Coaching Plans implemented during 2004, and the September 26, 2005 PIP.

The ADA and ADEA require the filing of a charge of discrimination with the EEOC within 300 days after the alleged unlawful practice.  29 U.S.C. § 626(d)(2); 42 U.S.C.A.. § 2000e-5(e)(1).  In order to maintain a claim under the ADEA and ADA Plaintiff would have

---

[8]Constructive discharge, as asserted by Plaintiff in this case, "acts as the functional equivalent of an actual termination" for purposes of supporting an employment discrimination suit.  Angeloni v. Diocese of Scranton, 135 Fed. App'x 510, 513 (3d Cir. 2005).  Because the administrative charge was filed within 300 days of the alleged constructive discharge, the claim for relief based upon the termination of employment is timely.

to allege discriminatory acts occurred on or before September 29, 2005, 300 days prior to Plaintiff's EEOC filing.

Plaintiff asserts that his federal statutory claims are timely under the "hostile work environment theory of liability under the continuing violation doctrine."[9] (Brief in Opp. to S. J. Mot., Dkt. Entry 35, at 6.)  The continuing violation doctrine is "an 'equitable exception to the timely filing requirement' that applies 'when a defendant's conduct is part of a continuing practice.'"  Shenkan v. Potter, 71 Fed. App'x 893, 894-95 (3d Cir. 2003) (quoting Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001)).  Under the continuing violation doctrine, "'an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time-barred.'"  Id. at 895 (quoting Cowell, 263 F.3d at 292).  To establish a continuing violation, Plaintiff must allege "that the harassment is 'more than the occurrence of isolated or sporadic acts of intentional discrimination.'"  West v. Philadelphia Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995) (citations omitted).  As explained in West, 45 F.3d at 755:

---

[9]It is doubtful that Plaintiff's Complaint can be read to assert a claim for relief based upon a hostile work environment premised upon age and/or disability bias.  In this regard, the Complaint does not use the term "hostile environment."  Instead, the Complaint asserts that Defendant "discriminated against the Plaintiff by forcing him to retire due to his age and non-work related disability and retaliated against him in violation of the [ADEA], the [ADA], and the [PHRA] thus wrongfully discharging him."  (Complaint, Dkt. Entry 1, at ¶ 37.)

Once the plaintiff has alleged sufficient facts to support use of the continuing violation theory . . ., the 300-day filing period becomes irrelevant. . . . Plaintiff may then offer evidence of, and recover for, the entire continuing violation.  At that point as well, the Federal Rules of Evidence and the substantive law at issue, rather than the statutory filing period, should govern evidentiary determinations of the trial court.

Plaintiff has met this burden in this case.  He has alleged a course of harassment spanning several years that culminated in his forced resignation, which occurred within 300 days of the filing of the administrative charge of discrimination.  He has alleged that the course of harassment included being placed on coaching plans in 2004 and a PIP in 2005.  He has also claimed that he was subjected to intense supervision and treated unfairly by Aniska.  Essentially, Plaintiff claims that there was nothing he could do that would satisfy Aniska because Aniska had determined that Plaintiff had to go.  The alleged actionable conduct was "more than the occurrence of isolated or sporadic acts," but instead constituted "a persistent, on-going pattern."  Id. at 754.  Plaintiff's allegations are thus sufficient to defeat summary judgment on the statute of limitations issue with respect to the ADA and ADEA claims.[10]

_____

[10]It is important to draw a distinction between the statute of limitations inquiry and the issue of whether Plaintiff has presented sufficient evidence of discrimination to defeat summary judgment.  The statute of limitations issue concerns when the conduct allegedly occurred, and not whether the conduct violated the employee's statutory rights.  In the context of a constructive discharge claim, such as that presented here, there undoubtedly would be evidence of alleged discriminatory conduct that preceded the employee's termination of employment for some period of time.  Whether the complained-of conduct is

(continued...)

D.  Plaintiff's Federal Law Claims for Relief

"The Age Discrimination in Employment Act makes it generally unlawful for employers 'to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" Myers v. Delaware County Comty. Coll., No. 05-5855, 2007 WL 1322239, at *6 (E.D. Pa. Mar. 9, 2007) (quoting 29 U.S.C. § 623(a)). To establish a prima facie case of age discrimination under the ADEA, a plaintiff must establish that he: 1) is over the age of forty (40); 2) is qualified for the position in question;

---

[10](...continued)
sufficient to support a finding of constructive discharge is different than the issue of whether the Plaintiff's complaint about that conduct is timely.  Moreover, it is important to distinguish between a continuing violation claim and a hostile work environment claim.

> The former allows plaintiffs to recover for discriminatory or retaliatory acts otherwise time-barred if the acts are reasonably related to an ongoing policy of discrimination.  A . . . hostile work environment claim involves specific claims about the work environment, namely, that it is 'permeated with "discriminatory intimidation, ridicule, and insult," . . . "sufficiently severe or pervasive to alter conditions of the victim's employment or create an abusive working environment."'

Kincade v. O'Neill, No. Civ. 3:00CV1801, 2003 WL 22244943, at *4 (D. Conn. Sept. 29, 2003), vacated on other grounds by, Kincade v. Snow, No. Civ. 3:00cv1801, 2003 WL 22735064 (D. Conn. Nov. 10, 2003).  Resolution of the question of whether there is an actionable hostile environment should not be conflated with the issue of whether Plaintiff has alleged a pattern of conduct that could support a continuing violation exception to the 300 day filing requirement.  See O'Rourke v. City of Providence, 235 F.3d 713, 731 n.6 (1st Cir. 2001).

3) suffered an adverse employment decision; and (4) was replaced by a sufficiently younger person. Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 330 (3d Cir. 1995). The establishment of these four factors creates a presumption of age discrimination that may be rebutted by the employer through evidence of a legitimate nondiscriminatory reason for the adverse employment decision. Id. Once the employer provides a nondiscriminatory reason, the plaintiff has "the opportunity to demonstrate that the employer's stated reason was not its true reason, but merely a pretext for discrimination." Id.

The plaintiff asserting an ADA claim bears the initial burden of establishing a prima facie case of unlawful discrimination by demonstrating that: (1) he is a member of the protected class in that he has a "disability" as that term is defined in the ADA; (2) he is qualified for the position in that he can perform the work with or without reasonable accommodations; and (3) he has suffered an adverse employment decision as a result of discrimination. Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999). Once the plaintiff demonstrates a prima facie case of discrimination, the burden shifts to the employer to show some legitimate, non-discriminatory reason for the employment decision. If the employer can make this showing, the burden shifts back to the plaintiff to demonstrate that the asserted reason for the decision was a pretext for discrimination. Olson v. Gen'l Elec. Astrospace, 101 F.3d 947, 951-52 (3d Cir. 1996).

Defendant has contested the sufficiency of the evidence to warrant a trial on

30

Plaintiff's statutory discrimination claims.  In particular, Defendant asserts that Plaintiff has not adduced sufficient evidence to support a finding that he was constructively discharged. Absent a constructive discharge, Plaintiff cannot show that he sustained the requisite "adverse employment decision" to support his discrimination claims because he severed the employment relationship, not Defendant.

Plaintiff contends that his January 3, 2006, retirement was not voluntary, but instead, the result of  constructive discharge.  "Constructive discharge occurs when an 'employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 n.4 (3d Cir. 2006)).  In determining constructive discharge, an objective test is employed that analyzes "whether 'the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign.'" Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir. 1992) (quoting Goss v. Exxon Office Sys. Co., 747 F.2d 885, 887-88 (3d Cir. 1984)).

The measure of intolerability "'is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign – that is, whether he would have had no choice but to resign.'" Id. (quoting Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998)).  Furthermore, it must be proscribed discrimination

that causes the working conditions to be intolerable.  "Hence, the discriminatory conduct must be associated in some fashion with the intolerable atmosphere leading to the constructive discharge.  For this reason, there must be at least some relation between the occurrence of the discriminatory conduct and the employee's resignation." McWilliams v. W. Pennsylvania Hosp., 717 F. Supp. 351, 356 (W.D. Pa. 1989); see Thakkar v. Provident Nat. Bank, No. 90-3907, 1991 WL 274827, at *4 (E.D. Pa. Dec. 17, 1991); Beaubrun v. Inter Cultural Family, No. 05-6688, 2007 WL 172385 (E.D. Pa. Jan. 17, 2007).

An employer's suggestion or encouragement to resign is not dispositive in determining constructive discharge.  Angeloni v. Diocese of Scranton, 135 Fed. App'x 510, 513 (3d Cir. 2005) (citations omitted).  An employee's subjective assessment of work performance also does not establish a right to a trial on a constructive discharge claim:

> Every job has its frustrations, challenges and disappointments; these inhere in the nature of work.  An employee is protected from a calculated effort to pressure [him] into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by [his] co-workers. [He] is not, however, guaranteed a working environment free of stress.  The employment discrimination laws requires as an absolute precondition to suit that some adverse employment action have occurred.  They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.

Gray, 957 F.2d at 1083 (quoting Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)).  In this regard, "[a] performance evaluation, even if completely negative, is not a condition so intolerable a reasonable person would feel compelled to resign." Westfall v.

Vanguard Group, Inc., No. 06-4320, 2007 WL 1683849, at *4 (E.D. Pa. June 8, 2007) (citing

Acosta v. Catholic Health Initiatives, Inc., No. 02-1750, 2003 WL 176978, at *15 (E.D. Pa.

Jan. 24, 2003)).  An expectation of high standards, additionally, is not sufficient to sustain a

claim of constructive discharge.

> While we do not hold that an employer's imposition of unreasonably exacting
> standards of job performance may never amount to a constructive discharge,
> we are convinced that a constructive discharge claim based solely on
> evidence of close supervision of job performance must be critically examined
> so that the ADEA is not improperly used as a means of thwarting an
> employer's nondiscriminatory efforts to insist on high standards.

Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1162 (3d Cir. 1993).  "As a matter of law,

an employee's decision to resign rather than [make necessary improvements], can only be

described as being completely voluntary."  Acosta, 2003 WL 176978, at *15.

      Clowes provides  illustrative factors to consider in constructive discharge cases,

including whether the employee was demoted, pay or benefits were reduced, the employee

was involuntarily transferred to a less desirable position, job responsibilities were altered in

any way, unsatisfactory job evaluations were given, the employee requested to be

transferred to another position, and whether a grievance was filed regarding supervision.

Id. at 1161-62.  Although this list is not all encompassing, it provides a helpful foundation for

determining a claim's validity.

      In this case, Plaintiff did receive unsatisfactory job evaluations with which he

expressed disagreement by way of a complaint with the Human Resources Department of

Defendant and by way of a complaint with Defendant's Alertline.  Plaintiff, however, was not demoted, neither his pay nor his benefits were reduced, he was not involuntarily transferred, his job responsibilities were not altered, and he did not request a transfer.  Plaintiff admits that his "major reason for leaving was that [he] could see no end to this, [he] had been put on two coaching plans and a PIP and [he] had every reason to believe that following that PIP [he'd] be put on another coaching plan or another PIP."  (Deposition, Dkt. Entry 36-2, at 124-26.)  Plaintiff, however, does not link his performance evaluations and Aniska's evident micro-management with age or disability bias.

In this regard, Plaintiff's Alertline complaint is revealing.  Plaintiff complained that Aniska created "an unpleasant and tense working environment for the sales representatives . . . ."  (Id. at 3.)  Plaintiff reported that Aniska was "extremely critical of his subordinates and micro-manages them, instructing employees on every aspect of their jobs . . . .  Some of [Plaintiff's] coworkers (names withheld) have told him that they consider themselves lucky if they get through the day without crying due to [Aniska's] constant criticism."  Id.  Moreover, Plaintiff reported that Aniska was the cause of the "loss of valuable, productive employees," and that three employees in his district were "currently seeking transfers or jobs with other companies because they do not want to work with" Aniska.  Id.  These statements show that Aniska was critical and demanding of all employees under his supervision, not just Plaintiff.  There is no evidence that Aniska treated only older workers more harshly or that he singled

out for criticism those, like Plaintiff, who had overcome serious health problems.

There is no dispute that the performance standards enforced by Aniska applied to all Sales Representatives.  For instance, standards with respect to sales calls, luncheons, and continuing education applied to all Sales Representatives.  Critically absent from the record is any competent evidence that other Representatives who did not attain company standards were treated more favorably than Plaintiff.  The unsubstantiated assertions of Plaintiff that he was treated more harshly than co-workers does not constitute competent evidence upon which a reasonable jury could find in his favor.  See Anderson, 477 U.S. at 248; Schoch, 912 F.2d at 657 ("the object of Rule 56(e) 'is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit'").  Nor is an issue of material fact created by the statements of physicians who attested to Plaintiff's performance as their Sales Representative.  While Aniska may have been unfair and the treatment Plaintiff received unwarranted, bad conduct by a supervisor directed at all subordinates does not suffice to show discrimination based upon age or perceived disability.

That Aniska imposed exacting standards on Plaintiff is not, absent evidence of discriminatory animus, enough to prove intolerably discriminatory conduct sufficient to support a claim of constructive discharge.  See Clowes, 991 F.2d at 1162.  Although Plaintiff had received poor reviews and been placed on a PIP, he had been reassured by District Manager Esposito, that "as long as he worked hard and fulfilled all of his obligations,

he would be fine."[11]  (DSUMF, Dkt. Entry 23, at ¶ 70.)  A reasonable person would rely on the statements of management and Human Resources before capitulating to a rumor that a PIP was "the kiss of death."

Plaintiff considers the pattern of constant harassment to include the fact that he did not get a raise for three years, that he got low marks in subjective portions of his review, that he did not receive promotions, that Aniska used a generally negative tone and would seldom make good comments, that he sent Plaintiff out to shadow Amy Fink, and that his evaluations kept him from receiving stock options. (Deposition, Dkt. Entry 36-2, at 49, 50-51.)  Moreover, Plaintiff felt that his 2003 and 2004 reviews were generally embarrassing. (Id. at 50.)  However, he admits that some of these ratings were justified,[12] and admits to

_____

[11] Plaintiff also spoke with Julie Carretero from Human Resources notifying her that he had been put on a PIP and asking whether this was an indication that he should look for a new job.  Carretero responded "that she knew of people that did survive PIPs and that if [he] completed the PIP and complied with all of the instructions, that [he] should have nothing to worry about." (Deposition, Dkt. Entry 36-2, at 122.)  Plaintiff was also told by management that the expectation of a PIP is for the person to improve performance to a satisfactory level and become an even better representative.  (Id. at 138.)

[12] Plaintiff's comments to his 2004 Review stated: "my computer work was sub-par." (2004 Review Comments, Dkt. Entry 25-10, at 2.)  Moreover, Plaintiff admits, "I am not as aggressive as I should be, and I need improvement in probing and closing.  There are numerous other categories in which I could and should improve." (Id. at 3.)  Even more telling is his admission that, "[t]here is certainly an element of truth in my DM's criticisms.  I admit this, and admit my failings."  Plaintiff continued by noting that it was the tone, and not necessarily the fact of the criticism, that was most disturbing, stating that Aniska "seems to take great pleasure in pointing out these admitted faults.  He does so, not in a constructive manner, but in the worst words possible." (Id.)

making mistakes and missing deadlines.[13]  (2004 Review Comments II, Dkt. Entry 25-10, at

1.)  Indeed, those who supervised Plaintiff before Aniska found fault with Plaintiff in the area

of planning and administration.  Although Aniska used a negative tone and failed to make

positive comments, Plaintiff is not "guaranteed a working environment free of stress."  Gray,

957 F.2d at 1083.

 Aniska's isolated remarks suggesting that Plaintiff should consider retirement did not

create a work environment "permeated with 'discriminatory intimidation, ridicule, and insult'

. . . ."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  Plaintiff was employed in a

position in which he was not in constant contact with his supervisors, and instead, worked

alongside them only a few times a month.[14]  (Deposition, Dkt. Entry 36-2, at 39.)  Plaintiff

did not have daily contact with Aniska and admitted that although he got daily e-mails from

him, he only did ride-alongs with him a few times a month, and did not have frequent one-

on-one phone contact.  (Id. at 45.)

 None of Aniska's alleged discriminatory remarks were made in connection with

---

 [13] Regarding his 2004 Review, Plaintiff states: "There is a notation, 'Timely reporting
of all regular and ad hoc requests needs improvement'. . . . . Does this mean that I
occasionally miss a deadline? I submit that we all do." (Id.)  Additionally, Plaintiff states,
"[u]nder details per call: 2.3 details per call 'does not meet expectations'. I maintain that no
one details three products per call on all calls." (Id.)

 [14] Plaintiff admitted that on most days he was calling on physicians alone. (Id. at 31-
32.) Aniska rode along with Plaintiff approximately every two weeks for one or two days
after expressing concern for his sales methods and administrative work.  (Id. at 39-40.)

Plaintiff's evaluations and Plaintiff admits that Aniska did not mention retirement during reviews.  Plaintiff asserts that Aniska's "attitude" was that he should consider retiring.  (Id. at 68-69.)  Plaintiff claims that on his 2003 review Aniska was "picky" in pointing out certain flaws and that "the entire document, in general, in spirit . . .[was] harassing" because Aniska was pointing out "minuscule administrative things, things that in light of results, may seem trivial to many people." (Id. at 73, 76-78.)  Plaintiff complained that Aniska "was going pretty much by the book as much as he could," (id. at 67-68), but there is no evidence that the book was applied only to Plaintiff.

That working with Aniska may have been intolerable to Plaintiff does not mean that the intolerable supervision was the product of discrimination on the basis of age or disability.[15]  Plaintiff has failed to show that age or disability discrimination was associated

---

[15]Plaintiff contends that he falls within the coverage of the ADA, not because he had an impairment that substantially limited his ability to perform a major life activity, but because Aniska regarded Plaintiff as so impaired.  "There are two apparent ways in which individuals may fall within [the 'regarded as disabled'] statutory provision: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities." Sutton v. United Airlines, 527 U.S. 471, 489 (1999).  Plaintiff appears to rely upon the first approach, asserting that Aniska believed that Plaintiff's cancer treatment left him unable to perform the major life activity of working.  Plaintiff points to no evidence to substantiate his claim that Aniska perceived him to be disabled.  On the contrary, the evidence shows that Aniska believed Plaintiff capable of doing more than he was already doing.  Aniska did not seek to preclude Plaintiff from doing some aspect of his job; he wanted him to do more.  Plaintiff's testimony that Aniska inquired as to lingering effects of his surgery and cancer treatment does not suggest an attitude that Aniska regarded Plaintiff as disabled.  The test is not

(continued...)

with the alleged intolerable atmosphere.[16]  Nor is the assertion of Scherer that he was

asked to fire a person close to retirement and the statement in Brian Christman's affidavit

that he felt pressure to retire sufficient to show that Plaintiff was the victim of age

discrimination.  No details are provided with respect to either matter.  The identity of the

person that Scherer was to fire is not identified so there is no basis for determining whether

there was cause for the requested action.  Christman worked in York under the supervision

of someone other than Aniska.  Christman announced in January of 2003 his decision to

retire at the end of 2003, which he did.  (Christman Aff., Dkt. Entry 36-3, at ¶ 18) This action

---

[15](...continued)
whether the employer harbored some unsubstantiated bias with respect to the employee's
actual or perceived impairment; instead, the question is whether the employer "treated
plaintiff adversely because it regarded him as having an impairment that substantially limits
one or more major life activities."  Weber v. Strippit, Inc., 186 F.3d 907, 915 (8th Cir. 1999).
There is no evidence that Plaintiff was treated adversely because Aniska considered him to
be substantially limited in some major life activity.  Under these circumstances, there is
absolutely no basis for a disability discrimination claim.

[16]Because Plaintiff has not presented sufficient evidence to sustain a constructive
discharge claim, any hostile work environment claim that may have been pled cannot
survive summary judgment.  Five factors are to be assessed in considering a claim of
employment discrimination based upon a hostile or abusive work environment:  (1) the
plaintiff suffered intentional discrimination because of age or disability;  (2) the
discrimination was pervasive or severe; (3) the discrimination adversely affected the
plaintiff; (4) the discrimination would have detrimentally affected a reasonable person of the
same protected class in that position; and (5) the existence of respondeat superior liability.
See Shahin v. College Misericordia, No. 3:CV-02-0925, 2006 WL 2642355, at *11 (M.D. Pa.
Sept. 13, 2006).  As there is no evidence of intentional age or disability discrimination,
Plaintiff's hostile work environment claim fails.

of a planned retirement to occur one year after it was announced is inconsistent with an intolerable work environment due to age discrimination.  Furthermore, there is no evidence that Plaintiff considered Christman's departure to be attributable to a company-wide bias against older Sales Representatives.  Plaintiff focuses on Aniska, but has produced no evidence that Aniska micro-managed only older Sales Representatives.

In short, Plaintiff has not produced the type of evidence sufficient to support an inference that Defendant had created or tolerated an atmosphere so hostile to older or purportedly disabled workers that a reasonable person would have been compelled to retire as a result of the discriminatory environment.  Because Plaintiff was not constructively discharged and admits he was not fired, but instead voluntarily resigned (Deposition, Dkt. Entry 36-2, at 124-26), he can not show that he suffered an adverse employment decision. Accordingly, he cannot establish a prima facie case of  discrimination based upon his termination of the employment relationship.  See Embrico v. U.S. Steel Corp., 404 F. Supp. 2d 802, 820 (E.D. Pa. 2005), aff'd, 245 Fed. App'x 184 (3d Cir. 2007).

E. Retaliation

To establish a prima facie case of retaliation, a plaintiff must show: 1) engagement in protected conduct; 2) adverse action taken against the plaintiff by the employer; and 3) a causal link between the protected conduct and the employer's adverse actions.  Pittman v. Cont'l Airlines, Inc., 35 F. Supp. 2d 434, 445 (E.D. Pa. 1999) (citing Charlton, 25 F.3d at

201).  "Although timing and ongoing antagonism have often been the basis for the causal

link, . . . case law clearly has allowed a plaintiff to substantiate a causal connection for

purposes of the prima facie case through other types of circumstantial evidence that support

the inference."   Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000).  "[A]

plaintiff must show that a reasonable employee would have found the challenged action

materially adverse, 'which in this context means it well might have dissuaded a reasonable

worker from making or supporting a charge of discrimination.'" Burlington N. & Santa Fe Ry.

Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219

(C.A. D.C. 2006)).  Material adversity is thus required because "it is important to separate

significant from trivial harms."  Id.  "[P]etty slights, minor annoyances, and simple lack of

good manners will not create such deterrence." Id.

Plaintiff's Complaint alleges that he "notified the Human Relations Office and the

District Manager of the discriminatory conduct before his retirement, but that Defendant took

no action, conducted no investigation nor provided any remedial action."  (Dkt. Entry 1, ¶

67.)  During a 2005 meeting, Plaintiff met with Esposito, his Regional Manager, and

reiterated his complaints that Aniska was "very discouraging" and had "established a very

poor working relationship" with him and with other members of the district.  (Deposition, Dkt.

Entry 36-2, at 155.)  Plaintiff's claim of retaliation is based on his communications with

Human Resources and Esposito in the spring of 2005. (Id. at 158.)

Plaintiff has not established a causal relationship between implementation of the PIP and his complaint to the Human Resources Department.  The PIP was imposed some six months after Plaintiff sought the intercession of the Human Resources Department.  This passage of time dispels an inference of retaliatory motivation.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (citing cases where three or four months was too long); EEOC v. Yellow Freight Sys., Inc., 253 F.3d 943, 952-53 (7th Cir. 2001) (six weeks too long);  Wallace v. United Parcel Serv., Civ. Act. No. 02- 1685, 2006 WL 1806404, *5 (D.N.J. June 29, 2006) (two months insufficient), aff'd, No. 07-2336, 2007 WL 2988582 (3d Cir. 2007).

When asked what Plaintiff characterized as retaliation, Plaintiff stated:

> I don't believe I got a positive comment out of [Aniska] after that.  Everything that I did was not only not quite good enough, it was completely substandard. If he asked me to do more programs and I did more programs, it wasn't a question of I was disappointed that you didn't do more programs, it was phrased as you make absolutely no effort to do more programs.  If he asked for an increase in lunches, I did an increase in lunches.  It wasn't, you didn't do enough increase in lunches, it was, you make no effort to increase lunches.  That kind of negative comment on everything I did.  If I came out of a call, it was not, I wish you could have made more of an impact, it was, you made absolutely no impact on that call.

(Id. at 160.)  Plaintiff claimed that other retaliation included "[p]etty things," such as Aniska's "general surliness," "unbusinesslike" behavior, and complaints about everything and anything.  (Id. at 161.)

Other than Plaintiff's unsupported claims that the "harassment intensified following

[his] complaint," he has provided no additional evidence of a causal relationship between his complaining and adverse action taken by Defendant in retaliation.  Plaintiff's alleged "harassment" amounts to no more than "trivial annoyances and petty slights that commonly take place in the workplace."  See Nolan v. Swartz Campbell, LLC., No. 05-1508, 2008 WL 598291, at *20 (W.D. Pa. Feb. 29, 2008) (finding that delay in investigating complaint, being yelled at by a supervisor because of complaint, having files reviewed, failing to provide additional work, suggesting resentment by colleagues, and suggesting resignation were not acts of retaliation); Carter v. A.T.& T. Broadband/Comcast, No. 06-22, 2008 WL 4137972, at *13 (W.D. Pa. Aug. 29, 2008) (finding that notice of a "negative change" in supervisor's disposition did not support a retaliation claim under Burlington Northern, but instead was a "petty slight" or "minor annoyance[]").  More importantly, Plaintiff's depiction of Aniska's management following his complaint shows no difference in treatment from the period before he complained.  In fact, Plaintiff voiced the same complaints concerning Aniska's management style to the Human Resources Department and to Defendant's Alertline that he now says shows an intent to retaliate against him.

In summary, Plaintiff has not presented sufficient evidence to support a claim of retaliation.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's federal statutory claims.

F.  Plaintiff's Common Law Wrongful Discharge Claim

Plaintiff claims that he was constructively discharged in violation of public policy. Even if the evidence was sufficient to warrant a trial on the constructive discharge issue, dismissal of the wrongful discharge claim is warranted.

A Pennsylvania at-will employee may be terminated with or without justification, unless the discharge offends public policy.  "'[A]n employer (1) cannot require an employee to commit a crime [and fire the employee for refusing to do so], (2) cannot prevent an employee from  complying with a statutorily imposed duty, and (3) cannot discharge an employee when specifically prohibited from doing so by statute.'"  Frasier v. Nationwide Mut. Ins. Co., 352 F.3d 107, 111 (3d Cir. 2003) (quoting Hennessy v. Santiago, 708 A.2d 1269, 1273 (Pa. Super. 1998)).

Plaintiff claims that Defendant violated the ADA and ADEA in violation of public policy when he was constructively discharged.  (Dkt. Entry 35, at 12.)  However, "'a Plaintiff must do more than show a possible violation of a federal statute that implicates only [his] own personal interest.  The Plaintiff in some way must allege that some public policy of this Commonwealth is implicated, undermined, or violated because of the employer's termination of the employee.'"  Blake v. UPMC Passavant Hosp., No. 06-193, 2008 WL 936917, at *11 (W.D. Pa. Apr. 04, 2008) (quoting McLaughlin v. Gastrointestinal Specialists, Inc., 750 A.2d 283, 287 (Pa. 2000)) (emphasis in original).   Moreover, under state law, the

PHRA is the "exclusive statutory remedy for wrongful discharge on the basis of discrimination." Id. Accordingly, Defendant is entitled to summary judgment on the state common law claim of wrongful discharge.

G. Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress, Plaintiff must demonstrate that Defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency," and be regarded as "atrocious, and utterly intolerable in a civilized society." Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998). The acts alleged must involve the "most egregious conduct," and thus "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." Id. (quoting Cox v. Keystone Carbon, 861 F.2d 390, 395 (3d Cir. 1988)); see Palma v. Volunteers of Am., No. 04-919, 2006 WL 328352, at *8 (E.D. Pa. Feb. 9, 2006) ("Application of the doctrine is 'most limited' and 'extremely rare' in the employment context."). Intentional infliction of emotional distress claims in employment cases have been limited to instances where "'an employer engaged in both sexual harassment and other retaliatory behavior against an employee.'" Wilkins v. ABF Freight Sys., Inc., No. 03-6610, 2005 WL 2271866, at *9 (E.D. Pa. Sept. 15, 2005) (quoting Hoy, 720 A.2d at 754).

Plaintiff's retirement was not the result of constructive discharge. Moreover, Plaintiff

was not subjected to retaliation based on age or disability, and, even if he had suffered these wrongs, he would not be able to make a claim of intentional infliction of emotional distress because none of the conduct complained of amounts to extreme and outrageous conduct as a matter of law.  See Wilkins, 2005 WL 2271866, at *9.  Thus, Plaintiff's intentional infliction of emotion distress claim will be dismissed.

III.  CONCLUSION

Plaintiff has presented evidence that he was subjected to harsh treatment by an overly zealous manager who sought to require Plaintiff to abide by the letter of company policies.  It is understandable that a person with Plaintiff's experience and success would chafe at such micro-management.  But Plaintiff has not shown that the management style of Aniska was attributable to a discriminatory bias due to Plaintiff's age or a perception on Aniska's part that Plaintiff was substantially limited in some major life activity.  Nor has Plaintiff presented evidence to support his state law claims.  Defendant is plainly entitled to judgment in its favor.  An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

46

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES J. DOOLEY              :
                  Plaintiff       :
                                  :
    v.                            :        3:CV-07-0132
                                  :        (JUDGE VANASKIE)
CIBA/NOVARTIS-MORRISTOWN,          :
NOVARTIS PHARMACEUTICALS CORP.     :
                  Defendants      :

## ORDER

NOW, THIS 26th DAY OF JANUARY, 2009, for the reasons set forth in the

foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1. Defendant's Motion for Summary Judgment (Dkt. Entry 22) is GRANTED.

2. Plaintiff's Motion to Strike Statement of Undisputed Facts (Dkt. Entry 28) is

DENIED.

3. The Clerk of Court is directed to enter judgment in favor of Defendant and to mark

this matter CLOSED.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge